**23-1647 (L),**
**23-1648, 23-1649, 23-1650, 23-1651, 23-1652, 23-1781**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆—◆

OI EUROPEAN GROUP B.V.,

*Plaintiff-Appellee,*

—v.—

BOLIVARIAN REPUBLIC OF VENEZUELA,

*Defendant-Appellant,*

PETROLEOS DE VENEZUELA, S.A.,

*Intervenor-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## REPLY BRIEF FOR INTERVENOR-APPELLANT

JOSEPH D. PIZZURRO
KEVIN A. MEEHAN
JUAN O. PERLA
AUBRE G. DEAN
ALLESANDRA D. TYLER
CURTIS MALLET-PREVOST COLT
 & MOSLE LLP
101 Park Avenue, 34th Floor
New York, New York 10178
(212) 696-6000

*Attorneys for Intervenor-Appellant
 Petróleos de Venezuela, S.A.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................4

  I.  Appellees Have Failed to Rebut *Bancec*'s Strong Presumption Favoring PDVSA's Corporate Separateness under the FSIA..........................................4

    A. Appellees Have Shown Nothing More than Ordinary Features of Government Ownership under the Interim Government.........................4

    B. International Equitable Principles Favor Respecting PDVSA's Corporate Form under the Interim Government....................................15

    C. Only the Acts of the Interim Government Can Be Attributed to the Republic in Deciding the Status of PDVSA and Its Property in the United States ..................................................................17

    D. The Pertinent Time for the *Bancec* Analysis Is the Period Between the Attachment Motion and the Service of the Writ..............21

  II. The Same State-Law Rule Must Be Applied to Sovereign and Private Entities for Attaching Delaware Shares under Rule 69 and the FSIA ..........23

CONCLUSION ..............................................................................27

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases**

*Af-Cap, Inc. v. Republic of Congo*,
  462 F.3d 417 (5th Cir. 2006) ................................24

*Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.*,
  183 F.3d 1277 (11th Cir. 1999) ........................16

*Atcom Support LP v. M/V HC Nadja Maria*,
  No. 15-28-RGA, 2016 U.S. Dist. LEXIS 137305 (D. Del. Oct. 4, 2016)...........25

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
  584 F.3d 120 (2d Cir. 2009) ..........................22

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
  92 F. Supp. 920 (N.D. Cal. 1950)......................20

*Banque de France v. Equitable Trust Co.*,
  33 F.2d 202 (S.D.N.Y. 1929)...........................19

*Bramble Transp., Inc. v. Sam Senter Sales, Inc.*,
  294 A.2d 97 (Del. Super. Ct. 1971), *aff'd*, 294 A.2d 104 (Del. 1972)................22

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
  447 F.3d 411 (5th Cir. 2006) .........................8, 20

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.2d 684 (Del. 1959) ............................ 24, 25

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
  142 S. Ct. 1502 (2022).................................26

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  333 F. Supp. 3d 380 (D. Del. 2018)....................22

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) ......................... passim

*De Letelier v. Republic of Chile*,
  748 F.2d 790 (2d Cir. 1984) ..........................16

*Dexia Credit Local v. Rogan*,
  29 F.3d 612 (7th Cir. 2010) ..........................24

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009) .........................9

*EM Ltd. v. Banco Central de la Republica Argentina,*
   800 F.3d 78 (2d Cir. 2015) ................................................................5, 6

*Fed. Ins. Co. v. Richard I. Rubin & Co.,*
   12 F.3d 1270 (3d Cir. 1993) ...................................................................16

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
   462 U.S. 611 (1983)........................................................................ passim

*Gater Assets Ltd. v. Moldovagaz,*
   2 F.4th 42 (2d Cir. 2021) ...................................................................4, 6

*Guaranty Trust Co. of New York v. U.S.,*
   304 U.S. 126 (1938)................................................................................19

*Hester Int'l Corp. v. Fed. Republic of Nigeria,*
   879 F.2d 170 (5th Cir. 1989) ...................................................................9

*Heyer v. United States Bureau of Prisons,*
   984 F.3d 347 (4th Cir. 2021) .................................................................14

*Jiménez v. Palacios,*
   250 A.3d 814 (Del. Ch. Aug. 2, 2019), *aff'd,* 237 A.3d 68 (Del. 2020) ....... 20, 25

*Kensington Int'l Ltd. v. Republic of Congo,*
   03 Civ. 4578 (LAP), 2007 U.S. Dist. LEXIS 25282 (S.D.N.Y. 2007) .................8

*Kingsland Holding, Inc. v. Bracco,*
   No. 14817, 1996 Del. Ch. LEXIS 28 (Del. Ch. Mar. 5, 1996)............................25

*M. Salimoff & Co. v. Standard Oil Co.,*
   262 N.Y. 220 (N.Y. Ct. App. 1933).......................................................19

*N.C. State Conf. of the NAACP v. Raymond,*
   981 F.3d 295 (4th Cir. 2020) .................................................................14

*PDVSA United States Litig. Tr. v. Lukoil Pan Ams. LLC,*
   65 F.4th 556 (11th Cir. 2023) ................................................................20

*Republic of Iraq v. ABB AG,*
   920 F. Supp. 2d 517 (S.D.N.Y. 2013),
   *aff'd sub nom. Republic of Iraq v. ABB AG,* 768 F.3d 145 (2d Cir. 2014) ..........17

*Sao Paulo of the Federative Republic of Brazil v. Am. Tobacco Co.,*
   919 A.2d 1116 (Del. 2007) ....................................................................25

*Schreiber v. Kellogg,*
   50 F.3d 264 (3d Cir. 1995) ....................................................................24

*The Maret*,
 145 F.2d 431 (3d Cir. 1944) ........................................................ passim

*TransAmerica Leasing, Inc. v. La Republica de Venezuela*,
 200 F.3d 843 (D.C. Cir. 2000) ........................................................1, 9

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
 199 F.3d 94 (2d Cir. 1999) .................................................................8

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
 97 Civ. 6124 (JGK), 1999 U.S. Dist. LEXIS 7236 (S.D.N.Y. 1999).....................8

*United States v. Carrillo-Lopez*,
 No. 21-10233, 2023 U.S. App. LEXIS 12831 (9th Cir. May 22, 2023) ..............14

## Statutes and Rules

28 U.S.C. § 1606 ...................................................................... 23, 26

28 U.S.C. § 1608(b) ........................................................................21

8 Del. C. § 324(a)...................................................................... 22, 24

D. Del. LR 7.1.3(a) .........................................................................14

Fed. R. Civ. P. 69 .................................................................... passim

## Other Authorities

Restatement (Third) on Foreign Relations Law § 201 ...........................................17

## Foreign Laws

Presidential Decree No. 3, 2019 (Venez.) ...........................................1, 9

Statute to Govern a Transition to Democracy to Reestablish the
 Full Force and Effect of the Constitution of the
 Bolivarian Republic of Venezuela, 2019 (Venez.)...................................... passim

# **INTRODUCTION**

Appellees could not defend the District Court's primary holding that PDVSA, as managed by the *ad hoc* Board, is Venezuela's alter ego under the Interim Government. Indeed, the record shows that the Interim Government—the only U.S.-recognized government of Venezuela—treats PDVSA like a typical government instrumentality, and that the *ad hoc* Board—PDVSA's only duly appointed board—makes independent business decisions consistent with applicable Venezuelan laws including the Transition Statute and Presidential Decree No. 3.

Appellees' meager efforts to defend the District Court's "findings of fact" fall short of showing the degree of extensive control required to pierce the veil under *Bancec*. Appellees ponder how much control there must be to rebut *Bancec*'s strong presumption of corporate separateness (OIEG Br. 40), but they don't have to wonder because this Court, like its sister circuits, has answered that question by requiring extensive day-to-day control to the point of "complete domination." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 143 (3d Cir. 2019) ("*Crystallex II*") (quoting *TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000)).

Appellees emphasize that the District Court repeated some of the reasoning in *Crystallex II*, but they ignore that, in that case, the Maduro regime's "complete domination" of PDVSA prior to 2019 was undisputed based on facts that are

entirely lacking here. Appellees' defense of the handful of instances where the

District Court addressed issues relevant to "complete domination"—rather than

simply pointing to facts that are always true for state-owned companies—is

directly refuted by the only testifying witness with personal knowledge

(Mr. Medina, the chair of PDVSA's *ad hoc* Board). It is also based on unfavorable

inferences that impermissibly fly in the face of *Bancec*'s strong presumption of

separateness. Simply put, the record comes nowhere close to establishing

"complete domination" by the Interim Government.

So appellees have opted instead to rely on an alternative, far-reaching theory

that the unrecognized, illegitimate Maduro regime should be treated as acting on

behalf of the "state of Venezuela" to make the "global enterprise" of PDVSA into

an alter ego. OIEG Br. 10, 12. In appellees' view, the United States' recognition of

the Interim Government does not alter that analysis. OIEG Br. 31. But appellees

cannot simply wish away the legal consequences of the United States' recognition

of the Interim Government. As a result of that recognition, under bedrock U.S.

foreign-relations principles, the Maduro regime does not act or speak on behalf of

Venezuela—so whatever abuses it has perpetrated against PDVSA outside the

United States are the acts of a third party and cannot legally establish that the

Republic itself exercises extensive control over PDVSA.

As this Court made clear in *The Maret*, 145 F.2d 431 (3d Cir. 1944), recognition of a foreign government by the Executive Branch is not limited to the realm of diplomacy but extends fully into any analysis of who owns and controls the property of a foreign state or its instrumentality in the United States, such as PDVSA's shares in PDVH. Any efforts to reach that property by private parties must yield to the United States' recognition of who is the proper and sole owner of PDVSA and the PDVH shares. Appellees have not pointed to any intervening Supreme Court precedent that would permit a panel of this Court to overrule *The Maret* and credit the acts and decrees of an unrecognized, rogue regime in that inquiry. And they cannot distinguish the recent decisions by the D.C. Circuit, the Eleventh Circuit and the Delaware Chancery Court rejecting the proposition that the unrecognized Maduro regime speaks or acts on behalf of the Republic or PDVSA. *See* PDVS Br. 10, 43, 44-45.

Finally, appellees have failed to defend the District Court's refusal to apply Delaware state law, as required by Federal Rule of Civil Procedure 69(a), to the question of whether PDVSA's non-immune shares of stock in a Delaware corporation may be attached in satisfaction of a judgment against the Republic. Once the District Court (incorrectly) made the threshold determination that PDVSA and its property are not entitled to sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), the court should have proceeded to determine,

pursuant to Rule 69(a), whether Delaware law allows judgment creditors of the

Republic to attach shares in a Delaware corporation held by PDVSA.[1]

## ARGUMENT

## I.    Appellees Have Failed to Rebut *Bancec*'s Strong Presumption Favoring PDVSA's Corporate Separateness under the FSIA

Appellees do not dispute that *Bancec* establishes a "strong presumption" in

favor of respecting PDVSA's corporate separateness, and that the burden is heavy

and the bar is high for overcoming that presumption. *Crystallex II*, 932 F.3d at 140,

151 ("[The *Bancec* presumption] is not to be taken lightly."); *accord Gater Assets*

*Ltd. v. Moldovagaz*, 2 F.4th 42, 56 (2d Cir. 2021). Nor do they dispute that, to

overcome that strong presumption, plaintiffs have the burden of showing extensive

day-to-day control—beyond "normal supervisory control"—amounting to

"complete domination." *Crystallex II*, 932 F.3d at 143. Appellees have not carried

their burden, nor could they, with respect to the Interim Government and PDVSA.

### A.    Appellees Have Shown Nothing More than Ordinary Features of Government Ownership under the Interim Government

When compared to the abundant evidence of the Maduro regime's abusive

control of PDVSA, the record relating to the Interim Government reveals nothing

more than ordinary supervisory control by a government parent over its wholly

---

[1] Pursuant to this Court's May 1, 2023 order, PDVSA hereby incorporates the arguments presented in the Republic's brief filed today in appeal No. 23-1781.

owned corporation. *See EM Ltd. v. Banco Central de la Republica Argentina*, 800 F.3d 78, 93 (2d Cir. 2015) ("*EML*") ("Governments commonly exercise some measure of control over their instrumentalities, much like parent corporations commonly control certain aspects of otherwise independent subsidiaries."). Nevertheless, appellees argue that the District Court was correct to treat those normal features of government ownership as evidence of extensive control under a "totality-of-the-circumstances inquiry." OIEG Br. 37. But when, as here, the record is devoid of any evidence of abusive control by the Interim Government, treating PDVSA as Venezuela's alter ego turns the *Bancec* presumption on its head, exposing a vast majority of state-owned enterprises to alter-ego determinations as a matter of course.

Indeed, most if not all of the facts the District Court relied on with respect to the Interim Government and PDVSA are ordinary features of government ownership, which are true of virtually all state-owned enterprises. Because appellees have no evidence to show that the Interim Government dominates PDVSA's day-to-day operations, appellees are reduced to recasting those normal features as purported indicia of extensive control. This Court should reject that approach consistent with *Bancec* and *Crystallex II*, which would not have reached the same outcome on the basis of these characteristics alone. *Crystallex II*, 932 F.3d at 143 (concluding that "normal supervisory control" is not enough, and

relying on additional facts showing abuse of that control); *see also EML*, 800 F.3d at 95.

For example, it is normal for state-owned enterprises to be tasked with implementing policies and strategic guidelines set by their government shareholders. *See First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba* ("*Bancec*"), 462 U.S. 611, 613, 625 (1983); *Gater Assets*, 2 F.4th at 56-57. In fact, the record confirms that this is true of state oil companies around the world. *See, e.g.*, JA2119-20 (¶ 27) ("[T]he Norwegian State requires Statoil … to take account of the Norwegian State's interests in all decisions that may affect the development and marketing of Statoil's own and the Norwegian State's oil and gas."); JA2114-15 (¶ 17) (statement by Indonesian national oil company Pertamina that its goals include "[i]mplementing and supporting [the] Government's policies and programs in Economic and National Development"); JA2121 (¶ 31) (stating that Saudi Arabia's Minister of Petroleum and Mineral Resources "ensures that Saudi Aramco fulfills the Government's oil policies"); JA2118-19 (¶ 24) (Mexican national oil company); JA2111 (¶ 10) (Algerian national oil company); JA2111-12 (¶ 11) (Angolan national oil company); JA2113 (¶ 14) (China's petrochemical company); JA2120 (¶ 28) (Qatar Petroleum).

Given the importance of many state-owned enterprises to their national economies and the fact that many of these enterprises are entrusted with managing

vital natural resources, it is also common for a government shareholder to require shareholder or regulatory approval for important decisions. For instance, Norway's majority-owned state oil company (Statoil) must first receive the approval of the Norwegian Parliament for certain decisions implicating state interests, such as where the company seeks to raise capital through the issuance of additional shares. *See* JA2719; JA2722; *see also, e.g.*, JA2113 (¶ 14) (explaining that certain of Sinopec's "development plans require compliance with state policies and governmental regulation"); JA2114 (¶ 15) (statement by the Indian national oil company that it "compl[ies] with government directives to discharge its social responsibility"); JA2727 ("The [Qatar] Council of Ministers closely supervises the crude oil industry, including the state oil company Qatar Petroleum.").

And it is virtually always the case that one of the goals, if not the primary goal, of a state-owned enterprise is to benefit the state and its people—a commitment that government officials and company leaders often repeat publicly. *See Bancec*, 462 U.S. at 625; *see, e.g.*, JA2720 ("The Norwegian State's policy as a shareholder in Statoil has been and continues to be to ensure that petroleum activities create the highest possible value for the Norwegian State."); JA2759–61 (discussing Saudi Aramco's efforts "to generate greater economic benefits for the people of the Kingdom"); JA2565–66 (similar statement by Algeria); JA2577 (similar statement by Angola); JA2607 (similar statement by China's

petrochemical company); JA2661 (similar statement regarding Indonesia's state energy company). If the District Court's alter-ego determination with respect to the Interim Government were accepted, all of these state oil companies could also be deemed alter egos of their governments, contrary to *Bancec*'s command that such findings should be the exception, not the rule. 462 U.S. at 626.

Like the District Court, appellees ignore this evidence. Appellees' only response is to argue that courts supposedly "often" find that "state oil companies in petrostates like Venezuela are alter egos of the state." OIEG Br. 27 n.3. But, unsurprisingly, appellees cite only cases in which foreign governments engaged in shell games or fraudulent schemes to shield their state oil companies' assets from creditors or in which a state oil company repeatedly disregarded its subsidiary's corporate form, such as by entering into contracts on behalf of the subsidiary without its approval.[2] OIEG Br. 27 n.3. Nothing remotely like that has even been alleged, let alone proved, with respect to the Interim Government.

Appellees also mischaracterize the Transition Statute and related decrees and attempt to recast PDVSA's obligation to comply with applicable laws, which all

---

[2] *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416-17, 420 (5th Cir. 2006); *Kensington Int'l Ltd. v. Republic of Congo*, 03 Civ. 4578 (LAP), 2007 U.S. Dist. LEXIS 25282, at *24-26 (S.D.N.Y. 2007); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (incorporating *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 97 Civ. 6124 (JGK), 1999 U.S. Dist. LEXIS 7236, at *31-35 (S.D.N.Y. 1999)).

companies must do, as indicia of extensive control. OIEG Br. 38-39, 41-42. Like the District Court, appellees hone in on the oversight provision of Article 34 of the Transition Statute, *id*. at 38, while downplaying or outright ignoring other provisions, such as Article 7 of Presidential Decree No. 3, which requires the *ad hoc* Board "to exercise the powers conferred herein autonomously and independently, following only technical criteria," insulates the *ad hoc* Board from "political or partisan guidelines," and prohibits the use of PDVSA's assets for the sole "benefit of the Republic." JA6755. They also ignore Mr. Medina's sworn testimony that, pursuant to these provisions, the *ad hoc* Board makes day-to-day decisions independent of the Interim Government. JA6691-92 (¶¶ 11, 11(a), 13).

Nor do appellees respond to PDVSA's argument that the control mechanisms established in the Transition Statutes are permissible exercises of the state's police powers and sovereign functions (like with the various state oil companies described above) and, as such, should not be conflated with shareholder day-to-day control. *See Doe v. Holy See*, 557 F.3d 1066, 1079-80 (9th Cir. 2009); *TransAmerica*, 200 F.3d at 851; *Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 180-81 (5th Cir. 1989).

Beyond ordinary features of government ownership and oversight, the few "findings" of supposed extensive control the District Court relied on, and appellees

repeat, are unsupported and contradicted by direct evidence and, in any case, do

not rise to the degree of abusive control required under *Bancec*:

- For the conclusory finding that the Interim Government "funds itself with PDVSA funds," OIEG Br. 39, appellees point to a Reuters story that merely states that the Venezuelan opposition "plans" to use funds derived from CITGO. JA5992. The other CBC article merely states that the Venezuelan opposition was given "access" to bank accounts containing PDVSA funds. JA5999. Both articles are unsourced hearsay and neither says anything about "intercepting" or "bypassing dividends." OIEG Br. 12, 29, 41.

- For the conclusory finding that there is "commingling" of funds, OIEG Br. 39, 41, appellees do not rely on any evidence at all. Rather, they cite an opposing lawyer's argument at the April 30, 2021 hearing, JA8456, and the declaration of Mr. Gomez, who was an "expert" witness on Venezuelan law, not a fact witness, and who on cross-examination specifically limited his opinion to the meaning of Venezuelan law and disavowed any knowledge of how the Interim Government's funding is arranged. JA8345-47; JA8353-54.

- For the conclusory finding that "Venezuela will renegotiate PDVSA's debt on its behalf," OIEG Br. 40, appellees cite nothing in the record. That is because the policy paper relied on by the District Court for finding that Venezuela supposedly treats PDVSA and the Republic debts "interchangeably" says nothing of the sort. JA44 (¶ 85); *see also* JA5668-70. Unlike the Maduro regime's policy that "*Venezuela* would restructure the external debt of *both* Venezuela and PDVSA," OIEG Br. 12 (emphasis added), all that the Interim Government's policy paper establishes is an aspirational commitment to honor the Maduro regime's legacy debt and to set up a yet-to-be defined process for creditors of the Republic and of state-owned entities, such as PDVSA, to participate on equal

terms. JA5668-69. There is nothing about using PDVSA's assets to pay the Republic's creditors, or anything about negotiating "on behalf of" PDVSA, in the Interim Government's policy.

- For the conclusory finding that "the Interim Government (rather than PDVSA itself) 'removed' the boards of the PDVSA's U.S. subsidiaries and reappointed new boards," appellees cite a declaration by the Interim Government's former Special Attorney General, which says the opposite, *i.e.*, that the Interim Government appoints PDVSA's *ad hoc* Board, and the *ad hoc* Board then appoints the board of PDVH and so on down the corporate chain consistent with the Transition Statute, JA5787 (¶¶ 12(a), (b)), and that once the boards of those entities were cleared of all of the illegitimate Maduro regime's appointees, the board of each corporate entity was appointed by its respective shareholders' board. JA5788 (¶ 14).

- For the conclusory finding that "PDVSA's assets and debts *are the Republic's assets and debts*," OIEG Br. 40, appellees continue to rely on nothing more than statements from media interviews, tweets, websites or press releases, none of which refer to any particular instance in which a specific asset of PDVSA was used directly by the Interim Government. If any such statement existed, the legion of lawyers for appellees would have certainly found it and cited it—but none of them have.[3]

---

[3] Appellees claim that the Interim Government controls PDVSA's bonds. Not so. The National Assembly determined that the 2020 bonds were invalid because certain collateral was pledged without proper authorization under Venezuelan law. JA6888; JA6890-93. PDVSA then acted in accordance with Venezuelan law in treating the bonds as invalid. JA6893. In fact, Mr. Medina explained that, rather than show extensive control by the National Assembly, that situation demonstrates that PDVSA acts independently because PDVSA insisted on making a payment without prejudice in the best interest of PDVSA, even though the National Assembly objected. JA6888; *see also* JA8285.

Mr. Medina's sworn testimony directly rebutted all of those allegations, yet the District Court simply ignored that testimony without even making an adverse credibility determination. Mr. Medina testified that the "Interim Government does not exercise day-to-day control over" the *ad hoc* Board and that the *ad hoc* Board "has ensured that the assets and property under its control are used for business purposes only, and not for the benefit of Venezuela." JA6691-92 (¶¶ 11, 11(a), 13). He categorically denied as "false" any allegation that the Interim Government funds itself with PDVSA's funds "bypassing PDVSA's corporate right to dividends." JA6696 (¶ 19). He explained that PDVSA funds are not available to the Interim Government and that the only instance in which PDVSA's money was used to pay for the Republic's legal fees was done as a "loan" with the proper authorization of the *ad hoc* Board in the interest of protecting *PDVSA's assets* in U.S. litigations. JA6695-96 (¶¶ 17, 19). Contrary to appellees' suggestions, there is nothing improper about intra-corporate loans. Appellees had the opportunity to cross-examine Mr. Medina, yet never inquired into, let alone impeached, that testimony, or even attempted to establish their new contention that PDVSA's loans to the Republic were supposedly "undocumented." OIEG Br. 39.

Mr. Medina also directly refuted the notion that the *ad hoc* Board has made public statements intending to show that "the Interim Government and PDVSA are failing to observe corporate formalities." JA6693 (¶ 14). He explained that

- 12 -

statements referring to PDVSA and its U.S. subsidiaries as "'assets' of Venezuela" are "soundbites" or "shorthand" for referring to the Republic's indirect ownership of PDVSA, and reflect the national understanding of all Venezuelans that PDVSA and its U.S. subsidiaries are "important to Venezuela's petroleum export trade" and "the loss of any of those companies would in fact have an indirect negative impact on Venezuela." *Id.*

He confirmed that the Interim Government, PDVSA and its U.S. subsidiaries had followed the procedures set out in the Transition Statute for appointing each entity's board. JA6688-89 (¶ 4). And he dispelled any notion that the Interim Government's debt restructuring policy means that the "Interim Government does not distinguish between the assets and liabilities of the Republic and PDVSA." JA6694 (¶ 15) ("That is not true."). He clarified that PDVSA has a business interest in negotiating with creditors of the Republic and PDVSA on equal terms given "the fact that creditors of the Republic and PDVSA have attempted to satisfy their obligations by seizing and/or selling the assets of PDVSA." *Id.*[4]

---

[4] Despite Rusoro's assertions to the contrary, this Court may and should consider the Medina declaration and the Pacheco declaration appended thereto with respect to Rusoro, as Rusoro itself submitted the transcript of Mr. Medina's cross-examination at the April 30, 2021 hearing, which was based on his declaration. JA8788; JA8797-99; JA8863-8926; *see also* JA8942 (admitting the Pacheco declaration into the record at the April 30 hearing). Rusoro relied on Mr. Medina's testimony for its own responsive findings of fact. JA9472 (¶ 7(c)); JA9474 (¶ 15(a)). PDVSA cited to both declarations in the Rusoro proceedings in both its cross-motion and proposed findings of fact. *See, e.g.*, JA9429; *Rusoro*, 21-mc-

Given the absence of any direct evidence to support their conclusory allegations, appellees lean heavily on the District Court's "findings of fact" as if they were evidence of the fact itself. But those "findings of fact" should be discarded as clearly erroneous, because they are merely unfavorable inferences drawn from those same unsourced reports or mischaracterized statements, without engaging with Mr. Medina's contrary sworn testimony or making any adverse credibility determination. *See Heyer v. United States Bureau of Prisons*, 984 F.3d 347, 360-62 (4th Cir. 2021) (reversing findings of fact as clearly erroneous where they rested in part on the district court's "conclusory dismissal" of witness testimony); PDVSA Br. 31-32. Consistent with *Bancec*'s strong presumption, the District Court was required to do the opposite, *i.e.*, give PDVSA the benefit of the doubt and draw favorable inferences, if any, in light of Mr. Medina's unimpeached testimony. The District Court's failure to do so is another reason to reverse those findings as clearly erroneous. *See United States v. Carrillo-Lopez*, No. 21-10233, 2023 U.S. App. LEXIS 12831, at *4, *12, *44 (9th Cir. May 22, 2023) (reversing adverse inferences as clearly erroneous for being contrary to an applicable "strong presumption"); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (same); PDVSA Br. 30-31.

---

00481, D.I. 33, at 8. Citing to dockets in others cases, like citing URLs, instead of submitting paper copies of the document is permissible. *See* Delaware District Court Local Rules 7.1.3(a)(5), (6).

### B.    International Equitable Principles Favor Respecting PDVSA's Corporate Form under the Interim Government

Appellees do not have judgments against PDVSA, and they admit that, unlike in *Crystallex II*, PDVSA has not benefited from the events underlying their judgments, OIEG Br. 44, which was a critical element of this Court's fairness analysis in *Crystallex II*. 932 F.3d at 149. Still, appellees argue that it would be inequitable to respect PDVSA's separateness because their judgments would remain unsatisfied. According to appellees, that should be enough because the Republic and PDVSA generally benefit from receiving financing backed by the U.S. courts. The equitable analysis under *Bancec* is not that simplistic, and thus the District Court's resulting alter-ego determination was manifestly inequitable.

"[I]nternationally recognized equitable principles" and "congressional policies," as identified in *Bancec*, favor respecting PDVSA's corporate separateness under the Interim Government. 462 U.S. at 623, 633. With the support of the U.S. government, the Interim Government acted in exigent circumstances to assert shareholder control of PDVSA and protect its assets from the unrecognized, illegitimate Maduro regime—a necessary step to protect PDVSA's property in the United States during a transition of power. To now treat those measures as evidence of extensive control would violate the most basic of international equitable principles.

Moreover, as explained in PDVSA's opening brief (at 40), the inequity with which *Bancec* was concerned was allowing Cuba to recover on a claim against a U.S. bank in a U.S. court while interposing a separate juridical entity to shield itself from a counterclaim "in a related proceeding." *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1290 n.16 (3d Cir. 1993). That is not what is happening here. Neither the Republic nor PDVSA is seeking affirmative relief against any of these appellees.

To the extent appellees believe that it would be unfair for creditors of the Republic not to be able to enforce their judgments against PDVSA's assets, their complaint is with the *Bancec* presumption itself. A general "concern about the injustice of preventing plaintiffs from collecting their judgment . . . is present in every case" where a corporate instrumentality's separateness is respected. *Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.*, 183 F.3d 1277, 1286–87 (11th Cir. 1999). But that is "not the type of injustice that concerned the *Bancec* Court." *Id*. at 1286 n.22. "Allowing the *Bancec* presumption of separate juridical status to be so easily overcome would effectively render it a nullity." *Id.* at 1287. Indeed, courts have recognized that by conferring sovereign immunity on a foreign state's instrumentalities and their property under the FSIA, "Congress did in fact create a right without a remedy." *De Letelier v. Republic of Chile*, 748 F.2d 790, 798 (2d Cir. 1984).

- 16 -

**C.    Only the Acts of the Interim Government Can Be Attributed to the Republic in Deciding the Status of PDVSA and Its Property in the United States**

Realizing that the District Court's alter-ego determination is indefensible based solely on the Interim Government's relationship to the *ad hoc* Board, appellees argue that the actions of the unrecognized Maduro regime should also be considered in the alter-ego analysis. But appellees fail to bring this case out from under this Court's binding precedent in *The Maret* and the Supreme Court precedent underpinning it, which make clear that only the U.S.-recognized government's actions can be attributed to Venezuela.

Contrary to appellees' suggestion, the issue here is not about the continuity of the "state," which is what Section 201 of the Restatement (Third) on Foreign Relations Law addresses. OIEG Br. 32-33. Nor is this a case about the state's responsibility for a prior government's conduct, as was the case in *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 541 (S.D.N.Y. 2013), *aff'd sub nom. Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014).[5] The only issue here is whether the acts and decrees of a foreign regime that is not recognized and, in fact, has been explicitly derecognized by the United States can be attributed to Venezuela in

---

[5] That case did not involve an unrecognized government. Rather, it dealt with state responsibility incurred under a government considered illegitimate under that country's laws but that was recognized by the United States at all relevant times.

determining rights in property in the United States. This Court has already answered that same question in the negative.

In *The Maret*, this Court held that "[w]hen the fact of nonrecognition of a foreign sovereign and nonrecognition of its decrees by our Executive is demonstrated as in the case at bar, the courts of this country may not examine the effect of decrees of the unrecognized foreign sovereign and determine rights in property [in the United States] upon the basis of those decrees." 145 F.2d at 442. Thus, it was legal error for the District Court to look to the actions and decrees of the unrecognized Maduro regime in deciding whether PDVSA, a state-owned enterprise, is the alter ego of the Republic as part of an analysis intended to ascertain the true owner of property located in Delaware, *i.e.*, the PDVH shares.

The facts in *The Maret* are squarely on point. It involved dueling governments attempting to speak and act on behalf of an Estonian ship (The Maret). An Estonian private company owned The Maret when the Soviet regime seized control of Estonia and purported to nationalize the ship in 1940. 145 F.2d at 433. At the time of the events, the U.S. government had yet to recognize the Soviet regime and still recognized the prior Estonian government and its consular representative in New York. *Id.* at 434, 438. The captain of the ship received and followed orders from the Soviet regime to buy supplies and sail to a new destination. *Id.* Later, the U.S. government seized the ship, and a New York

company asserted a maritime lien to recover compensation for unpaid supplies that were purchased at the instruction of the Soviet regime. *Id.* at 436-37. This Court had to consider who was the rightful owner of the ship in deciding whether the maritime lien was valid. *Id*. at 437, 439. The Court concluded that giving any effect to the unrecognized Soviet regime's expropriation decree (and by extension crediting the Soviet regime's instructions to the ship as its purported owner) would run counter to the Executive's sole authority to recognize foreign governments. *Id*. at 440, 442. That holding disposes of the issue here.

Appellees' erroneous contention that the United States has "recognized" the Maduro regime as the "*de facto* government" is inaccurate. The only position expressed by the United States with respect to the Maduro regime is one of derecognition. JA359; JA487; JA493-94; JA4114. In *The Maret*, this Court acknowledged that the Soviet regime was "now functioning in Estonia," and that it was "common knowledge" that the Soviet "government" was "exercising general jurisdiction throughout the whole of Estonia." 145 F.2d at 438-39. Nevertheless, this Court held that the Soviet regime's *de facto* control did not change the analysis.[6]

---

[6] It also considered cases on which appellees and the District Court relied, such as *Guaranty Trust Co. of New York v. U.S.*, 304 U.S. 126 (1938), *M. Salimoff & Co. v. Standard Oil Co.*, 262 N.Y. 220 (N.Y. Ct. App. 1933), and *Banque de France v. Equitable Trust Co.*, 33 F.2d 202 (S.D.N.Y. 1929), and concluded that they do not dictate a different result. *The Maret*, 145 F.2d at 439-42. *Bank of China v. Wells*

In brief, as a matter of U.S. law, the Maduro regime's abuses of PDVSA are the illegal acts of a third party and thus entirely irrelevant to determining whether the Republic exercises complete domination over PDVSA. *See The Maret*, 145 F.2d at 442 (rejecting claims to rights in property premised on Soviet "ownership of the Maret," because "to do so would nullify the effect of nonrecognition by our Executive"). As the Eleventh Circuit and the Delaware Chancery Court have held, the only "sovereign" with standing to assert any ownership rights in PDVSA is the Interim Government and the only entity recognized as the "PDVSA" that owns the PDVH shares is the PDVSA governed by the *ad hoc* Board. *PDVSA United States Litig. Tr. v. Lukoil Pan Ams. LLC*, 65 F.4th 556, 562-63 (11th Cir. 2023); *Jiménez v. Palacios*, 250 A.3d 814, 819-20 (Del. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020); PDVSA Br. 10, 43-45. Appellees may find that reality inconvenient but, since they are seeking to attach property in the United States, they are bound by U.S. public policy and the legal consequences of the U.S. recognition of the Interim Government.[7] *See The Maret*, 145 F.2d at 442.

---

*Fargo Bank & Union Trust Co.*, 92 F. Supp. 920 (N.D. Cal. 1950), does not help appellees either. The court there explicitly considered the U.S. foreign policy underpinning the recognition of the exiled government to ensure its decision would not undermine but rather support that policy. 92 F. Supp. at 924. The court did not ultimately recognize any ownership interest by the unrecognized government. *Id.*

[7] Appellees, like the District Court, rely on *Bridas*, 447 F.3d at 416, JA71 (n.19), OIEG Br. 26-27, but that case had nothing to do with whether a U.S. court can attribute the acts of an unrecognized regime to the foreign state.

**D.    The Pertinent Time for the *Bancec* Analysis Is the Period Between the Attachment Motion and the Service of the Writ**

In a final attempt to avoid reversal of the District Court's erroneous alter-ego determination with respect to the Interim Government, appellees argue that the pertinent time for showing extensive control is the time when they were injured. Appellees are wrong. Even the District Court rejected that theory, because it contradicts appellees' invocation of Rule 69.

Like Crystallex, appellees registered their out-of-district judgments and filed motions to attach specific property, the PDVH shares, under Rule 69 on the theory that the shares were the Republic's property nominally held by its alleged alter ego, PDVSA. *See* JA224; JA234; JA236; JA248; JA259-61; JA263. None of these appellees are attempting to hold PDVSA liable *in personam*, and so none of them named PDVSA or served PDVSA as required under the FSIA. That strategy afforded them significant benefits, including being able to avoid the onerous service-of-process provisions of the FSIA. 28 U.S.C. § 1608(b). Thus, in this "post-judgment enforcement setting," *Crystallex II*, 932 F.3d at 138, the basis for an alter-ego determination is the theory that the Republic is the true owner of the targeted property. As the District Court recognized in *Crystallex*, that theory necessarily depends on PDVSA being the Republic's alter ego "at this time," *i.e.*, the time of the attachment proceedings, not at some point in the past, such as the

time of the injury giving rise to the judgment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela* ("*Crystallex I*"), 333 F. Supp. 3d 380, 394 (D. Del. 2018).

Property can only be attached if it is property of the debtor at the time the writ is served. *See Crystallex II*, 932 F.3d at 134 (citing 8 Del. C. § 324(a)); *see also Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009); *Bramble Transp., Inc. v. Sam Senter Sales, Inc.*, 294 A.2d 97, 100 (Del. Super. Ct. 1971), *aff'd*, 294 A.2d 104 (Del. 1972). Appellees cannot attach property that belonged to the Republic at some point in the past but no longer does.

To illustrate this point, the District Court in *Crystallex I* noted that, "if the Republic were to sell PDVSA before the Court rendered its judgment, Crystallex would have no redress against PDVSA," because Crystallex's alter-ego theory was intended to establish ownership of a particular asset rather than liability for a judgment. 333 F. Supp. 3d at 392 n.9. Likewise, plaintiffs cannot attach property that currently belongs to PDVSA on the theory that it belonged to the Republic years ago when appellees were injured.

None of the cases cited by appellees deal with an alter-ego inquiry in this Rule 69 context. Rather, those cases generally involve actions seeking to shift liability for the underlying injury to the putative alter ego. Plaintiffs' reliance on liability-shifting cases is thus misplaced. Whatever the pertinent time may be for attributing substantive liability to PDVSA, plaintiffs do not and cannot seek to

impose liability on PDVSA in this action. Indeed, like Crystallex, plaintiffs have intentionally invoked the District Court's limited ancillary jurisdiction in order to get around the FSIA's procedural and substantive protections from *in personam* actions seeking to impose or shift liability. Having made that strategic decision, they are stuck with it.

## II. The Same State-Law Rule Must Be Applied to Sovereign and Private Entities for Attaching Delaware Shares under Rule 69 and the FSIA

As explained in PDVSA's opening brief, Rule 69(a) and the FSIA, 28 U.S.C. § 1606, each independently require the application of Delaware law to determine whether Delaware shares held by PDVSA may be attached by judgment creditors of the Republic, and Delaware law is clear that those shares may be attached only if the creditors can show both extensive control and fraud or similar injustice—neither of which has been shown here.

Contrary to appellees' and Crystallex's arguments, *Crystallex II* never addressed the application of federal common law to the attachment inquiry. In *Crystallex II*, this Court held only that "*Bancec* controls the jurisdictional inquiry." 932 F.3d at 136. The applicability of Delaware law arose in *Crystallex II* only insofar as this Court considered whether it was bound by state law alter-ego rules in interpreting *Bancec*. It ultimately concluded that, unlike Delaware state law, *Bancec* does not require a showing of fraud or injustice, thereby creating a less stringent alter-ego test than would apply under the laws of Delaware. The question

remains whether *Bancec* displaces state law for purposes of determining the attachability of assets at the post-jurisdictional stage notwithstanding Rule 69. *See, e.g.*, *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 429-30, n.11 (5th Cir. 2006) (holding that, although the district court had "jurisdiction to consider" motions for garnishment under the FSIA, the writs nevertheless had to be quashed under Texas law). The cases appellees rely on are inapposite because they do not address that question.

Under Rule 69, federal common law does not displace state law. In the ordinary case, Rule 69 requires courts to "follow relevant state law in a proceeding to execute on a judgment, unless a federal statute dictates otherwise." *Schreiber v. Kellogg*, 50 F.3d 264, 267 (3d Cir. 1995). This includes questions of veil-piercing in order to reach assets. *See, e.g.*, *Dexia Credit Local v. Rogan*, 629 F.3d 612, 622-23 (7th Cir. 2010). Appellees and Crystallex do not and cannot dispute that Delaware law authorizes the attachment of Delaware shares to satisfy a debt only if the debtor "appears on the books of the corporation to hold or own such shares," 8 Del. C. § 324(a), and that this precludes attachment of shares held by an alleged alter ego in the absence of fraud or similar injustice, *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959).

ACL mistakenly argues that even if Delaware law governs the attachment inquiry under Rule 69, the Delaware Supreme Court, as a choice of law matter,

"would apply *Bancec* rather than its private-corporation precedent in the sovereign context; if they did not, Delaware law would be preempted." ACL Br. at 12. But no choice of law inquiry is required. Rule 69(a)(1) specifies that "[t]he procedure on execution … must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Here, that is Delaware law. Moreover, Delaware courts apply Delaware law to determine whether Delaware shares are subject to attachment on alter-ego grounds, even where both the debtor and the owner of the shares are foreign corporations. *See Buechner*, 154 A.2d at 686-87 (Canadian subsidiary and German parent); *Kingsland Holding, Inc. v. Bracco*, No. 14817, 1996 Del. Ch. LEXIS 28, at *1-2, *19-20 (Del. Ch. Mar. 5, 1996) (Netherlands subsidiary and Italian parent); *cf. Atcom Support LP v. M/V HC Nadja Maria*, No. 15-28-RGA, 2016 U.S. Dist. LEXIS 137305, at *10 (D. Del. Oct. 4, 2016) ("That the property is located in Delaware cannot be ignored. The state has an interest in determining to whom the property should rightfully go.").[8] While Congress might choose to exercise its authority to preempt state law in attachment actions against foreign sovereigns, it has not done so, and Rule 69 expresses the opposite choice

---

[8] The case law ACL relies upon is inapposite: neither *Sao Paulo of the Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007), nor *Jiménez*, 250 A.3d, addressed the applicability of federal common law to the attachment of property.

that, even in such actions, the applicable law varies depending on the state in which enforcement is sought.

Indeed, section 1606 of the FSIA makes clear that Congress did not intend to create a uniform federal law governing every question in proceedings against foreign states and, in fact, mandated that sovereign and private entities be treated the same in like circumstances. The Supreme Court confirmed the scope of section 1606 in *Cassirer v. Thyssen-Bornemisza Collection Found.*, holding that, once it has been determined that a foreign state or its instrumentality is not immune under the FSIA, section 1606 requires applying the same law that applies in an action against a private entity. 142 S. Ct. 1502, 1505 (2022) (explaining that section 1606 "demands" that a foreign instrumentality "be liable in the same way as a private party"). Here, again, that is Delaware law. Were the Delaware Supreme Court to turn to this Court's interpretation of *Bancec* in *Crystallex II* and apply it to the attachment question, it would run afoul of section 1606 because the "control alone" test adopted by this Court is undeniably less stringent than the applicable Delaware test.

## <u>CONCLUSION</u>

This Court should reverse the District Court's decision and related orders.

Respectfully Submitted,

CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP

*s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
Aubre G. Dean
Allesandra D. Tyler
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
kmeehan@curtis.com
jperla@curtis.com
adean@curtis.com
atyler@curtis.com

*Attorneys for Intervenor-Appellant*
*Petróleos de Venezuela, S.A.*

Submitted: May 30, 2023

## <u>COMBINED CERTIFICATIONS</u>

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May, 2023, I caused a copy of the foregoing Reply Brief to be filed with the Clerk of the Court of the United States Court of Appeals for the Third Circuit via the Court's Electronic Filing System, and to be served electronically upon all counsel of record through that system.

## CERTIFICATE OF BAR MEMBERSHIP

This Reply Brief complies with the Third Circuit's L.A.R. 28.3(d) because at least one of the attorneys whose names appear on the brief, including Joseph D. Pizzurro, is a member in good standing of the bar of this Court.

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(g), I hereby certify that the foregoing Reply Brief complies with the type-volume limitation, because it does not exceed 6,500 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). The foregoing Reply Brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in 14-Point Times New Roman proportional font using Microsoft Word. This PDF version of this Reply Brief that is being electronically filed also complies with L.A.R. 31.1(c) because it has been scanned with version 14 of Symantec Endpoint Protection and no virus was detected.

## CERTIFICATE OF IDENTICAL TEXT OF BRIEF

I hereby certify that the PDF version of this Reply Brief that is being electronically filed on May 30, 2023, is identical to the text of the hard copies of the brief that are being submitted to this Court.

Dated:   New York, New York
         May 30, 2023

                              *s/ Joseph D. Pizzurro*
                              Joseph D. Pizzurro